

**IT IS SO ORDERED.**
**Signed October 14, 2015**

**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

| | |
|---|---|
| In re | Case No. 06-50395-ASW |
| RAY RAZAVI, aka REZA TAHVILDAR-RAZAVI, | Chapter 7 |
| Debtor. | |
| MICHAEL ZAMANI,[1] | Adv. Proc. No. 06-5137 |
| Plaintiff, | |
| vs. | |
| RAY RAZAVI, aka REZA TAHVILDAR-RAZAVI, | |
| Defendant. | |

**MEMORANDUM DECISION ON PLAINTIFF'S CLAIM UNDER 11 U.S.C. § 523**

This matter came before the Court for trial on multiple dates in 2014 and 2015. The Plaintiff, Michael Zamani, appeared pro se. The Defendant and Debtor, Ray Razavi, appeared through attorney Stanley Zlotoff.

---

[1] See note 28, infra.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Following the last day of trial, the Court issued a briefing schedule for written closing arguments. Initially, Plaintiff's closing brief was due on February 28, 2015, with response and reply briefs due on March 31, 2015, and April 30, 2015, respectively. However, on March 2, 2015, Plaintiff moved for an enlargement of these deadlines, requesting that Plaintiff's brief be due on April 30, 2015. The Court granted the Plaintiff's motion and directed that Plaintiff's brief be filed by April 30, with response and reply briefs due on May 31[2] and June 30, 2015. Plaintiff did not file a brief. Defendant filed a brief on June 1, 2015.

Having considered the evidence presented at trial, as well as the arguments of the parties, the Court finds and concludes that Plaintiff has failed to meet his burden of proving that the Defendant's debt to Plaintiff is non-dischargeable under 11 U.S.C. § 523.

## I. Findings of Fact

The only claim at trial was a claim of embezzlement under 11 U.S.C. § 523(a)(4). Such claim was not particularly alleged in the Second Amended Complaint filed on February 26, 2007, which instead purported to assert a cause of action under § 523(a)(2). However, the Second Amended Complaint actually asserted multiple legal theories for nondischargeability under various subsections of § 523(a), including for embezzlement and fiduciary fraud. Plaintiff eventually abandoned most of these theories and refined the claim to two theories. The parties filed a Joint Case

---

[2] May 31, 2015 was a Sunday. Therefore, Defendant's brief could have been filed timely on June 1, 2015. As of the date of this decision, Plaintiff has filed no brief.

Management Conference Statement on September 20, 2013 -- signed by Plaintiff -- which stated that "Plaintiff alleges breach of fiduciary duty and embezzlement" based upon Defendant's allegedly unauthorized withdrawals of funds from Defendant's business.

On November 15, 2013, Defendant filed a motion for summary judgment on these remaining two claims, which Plaintiff opposed. After a hearing, the Court granted the motion as to the fiduciary fraud claim, but denied the motion as to the embezzlement claim.[3]

The parties then filed written statements concerning the trial setting. Plaintiff's statement, filed on March 21, 2014, explained that the claim to be tried was an embezzlement claim premised upon Defendant's misuse of cash from a business. The parties then filed trial briefs, which were also limited to the embezzlement claim. At trial, Plaintiff did not attempt to prove any claims under §§ 523(a)(2)(A) or (b), and Plaintiff has made no written or oral arguments to support any claim apart from the embezzlement claim.

Only two witnesses testified at trial: Defendant and Plaintiff. The presentation of testimony was disorganized. At first, Plaintiff called Defendant to testify in Plaintiff's case-in-chief. When Plaintiff was finished with Defendant, Plaintiff took the stand and examined himself. After Plaintiff was cross-examined by Defendant's attorney, Plaintiff intended to testify again but was not prepared to go forward, so Defendant's attorney presented a small amount of testimony from Defendant out of order, notwithstanding defense counsel's expressed desire to move for judgment on the Plaintiff's case.

---

[3] The Court's tentative decision denying summary judgment on the embezzlement claim was finalized on January 16, 2014, and docketed on January 17, 2014.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   The next trial day, Plaintiff was again unready to proceed
2   with redirect examination of himself, and recalled Defendant in
3   Plaintiff's case-in-chief.  During this renewed examination of
4   Defendant, Plaintiff covered some new territory but also repeated
5   many of the questions which had been asked early in the trial.
6   Defense counsel did not object to the repetitive nature of this
7   examination.  Finally, at the end of the last trial day, Plaintiff
8   again took the stand and testified as to a few subject areas.

9   The record was difficult to follow.  Throughout the trial,
10  Plaintiff interrupted Defendant's answers to questions, as well as
11  the Court and defense counsel, on numerous occasions.  Not only did
12  this interfere with a clean and complete record, but this was
13  disruptive to the proceedings as a whole, resulting in numerous
14  questions asked but never -- or only partially -- answered.

15  In addition, Plaintiff did not have records to support many of
16  his assertions.  Plaintiff did not retain or request copies of bank
17  records, vendor contracts, alleged guarantees, or other business
18  records to support Plaintiff's claims.  As a result, much of
19  Plaintiff's testimony was disconnected from any hard evidence,
20  making it less probative and harder to follow.

21  Regardless of these difficulties, the Court has reviewed the
22  testimony of each witness, and to the extent possible, has
23  summarized the testimony of each witness below, with reference to
24  the admitted exhibits as appropriate.

25

26  **A. Defendant's Testimony**

27  Defendant, Ray Razavi, was born in Tehran, Iran, in August
28  1969.  Defendant immigrated to the United States in 1987.

Defendant's birth name was Reza Tahvildar Razavi, but Defendant legally changed his name to Ray Razavi approximately 15 to 16 years ago.

At the time of his testimony, Defendant was 44 years old and had been married almost 14 years.  Defendant could not recall the specific year of his marriage, but thought the marriage occurred in either 1996 or 1998.  Defendant and his wife, Nicole, have two children.[4]

Defendant attended high school in Cupertino and attended college on and off for several years.  In either 1988 or 1989, Defendant started at DeAnza College, but also attended Foothill College.  About a decade later, Defendant continued with his college education at San Jose State University, resuming full-time studies in or about 1999 or 2000, and graduating in 2001 or 2002 with a bachelor's degree in aviation and with a grade point average of approximately 3.5.

**1. Defendant's Early Work in the Check Cashing Industry**

At some point between these two periods of college attendance, Defendant met Plaintiff.  Defendant could not recall exactly when the two met, but Defendant believed that it was when Defendant was working in a grocery store across the street from Plaintiff's print shop.  The grocery store was owned by two brothers -- Sharam (Ron) Roohparvar and Shahrokh (Shaw) Roohparvar ("the brothers" or "the Roohparvars").  Defendant is not directly related to the brothers

---

[4] Defendant's wife filed a separate bankruptcy petition in Case No. 11-50969-ASW.  She received a chapter 7 discharge on May 16, 2011.

but said that Defendant's cousin is married to the brothers' cousin.

The Roohparvars also owned a check cashing store called Money Market where Defendant worked as a cashier. Defendant cashed checks, sold money orders, transferred money via Western Union, prepared bank deposits, and performed several other tasks as requested by the brothers. Defendant insisted that Defendant was not a manager at the store, although the two brothers sometimes left Defendant in charge when the brothers traveled to Iran, which happened as frequently as once per year to every couple of years.

The Roohparvars had several stores. Defendant recalled a store on Union[5] and another store on Winchester, and vaguely recalled another store on 1st Street or on Monterey. Defendant thought there might have been a store on Story Road, as well as a store on The Alameda across from Plaintiff's business. At some point, the brothers also opened a store in Gilroy. Each store had a manager and a cashier.

Initially, Defendant worked mainly at The Alameda location. As needed, Defendant filled in for other cashiers and sometimes worked in the Gilroy store. Defendant believed that the last store where Defendant worked for the brothers was the Gilroy store. Defendant could not recall how long he worked there but said it was as long as a year, perhaps less. Defendant thought that he last worked there in 1996.

Defendant could not recall the hours he worked at the Gilroy store but stated that he opened and closed the store many days and

---

[5] In his testimony, Defendant did not specify Road, Blvd., etc. for many street names.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

worked mostly by himself. Defendant thought that he worked about 12 hours per day as many as seven days per week. Defendant could not recall the volume of business at the Gilroy store.

When the brothers were gone, Defendant was the key person for the money flowing through the brothers' stores, which was brought to The Alameda store from all of the stores to be deposited. Defendant could not recall who was responsible for preparing the deposit slips, but stated that Defendant was not the only person who made deposits. Defendant also could not recall the names of all of the people who worked at The Alameda location. Defendant agreed that it was possible that Defendant coordinated the deposits, but the employees took turns going to the bank. In addition to taking deposits to the bank, Defendant brought operating cash in varying amounts from the bank to the store.

When the brothers were traveling, Defendant was responsible for opening The Alameda store, possibly as often as seven days per week. Whoever closed the store that night was responsible for checking the accuracy of the accounting and reconciliation.

Defendant worked for the brothers for seven to eight years. When Defendant worked for the brothers, Defendant was always paid in cash. Defendant earned approximately $1,000 to $2,000 per month, but could not recall the exact figure. Defendant did not believe that the brothers deducted payroll taxes, and Defendant did not pay taxes on the income.

### 2. Defendant's Employment by Plaintiff

Defendant left Cash Mart and went to work for Plaintiff in approximately 1995 or 1996 when Plaintiff offered him a job with

better pay of approximately $2,500 per month. According to Defendant, Plaintiff had been trying to lure Defendant to work for Plaintiff for more than a year, and Plaintiff had approached Defendant multiple times to this end. When Defendant started working at the store, Defendant did not have a college degree and, according to Defendant's testimony, he had no experience performing financial work, having only worked as a clerk previously.[6]

Defendant paid income taxes on the wages paid by Plaintiff, but did not know if there were deductions for worker's compensation or payroll taxes. However, there were paystubs from SRA Enterprises which showed deductions.[7]

When Defendant began working for Plaintiff, Defendant recalled that Plaintiff had three check cashing stores on Camden Avenue, Saratoga Avenue, and Race Street. Defendant worked at the Saratoga store, but could not remember if Defendant was a manager or a cashier. Defendant could not recall managing all three stores at that time, but did recall making deposits for all three stores.

Plaintiff did not have a physical office space in the three stores, but each of the three stores had a desk where Plaintiff could work. Plaintiff kept an office in a building called "Apollo Direct Marketing" which was a large building across the street from a check cashing store.

Defendant believed that Plaintiff was only involved in the check cashing and print shop businesses, and not in any other

---

[6] While this was Defendant's testimony, Defendant's testimony also indicated that Defendant's previous work did include financial aspects.

[7] As discussed more fully _infra_, SRA Enterprises was Plaintiff's company, which Plaintiff incorporated in California.

1  businesses.  However, Defendant could not recall if Plaintiff also
2  owned any hair cutting businesses.

### 3. Defendant's Lease of the Camden Avenue Store

Defendant worked as Plaintiff's employee for a few months, but decided to lease the Camden Avenue store from Plaintiff sometime in 1996, so that Defendant could operate the business himself. Defendant originally thought that the lease might have begun in September 1996, but later acknowledged that he signed the lease on October 3, 1996, and that he read the lease prior to signing it.

The lease was entitled "Operating Store Lease Agreement."[8] The lease's stated effective date was October 1, 1996, and it allowed Defendant to operate the Cash Mart located on Camden Avenue for a period of 12 months in exchange for monthly rent. The lease identified Defendant as the lessee, and SRA Enterprises, Inc. ("SRA"), as the lessor.[9] For the first three months, rent was set at $1,600 per month; for the second three months, rent was raised to $1,800 per month; and for the balance of the term, rent was set at $2,200 per month.[10]

The lease stated that SRA would provide Defendant with $10,000 in cash inventory "for use by Ray." However, the cash inventory was to remain SRA's property, and the lease required the return of

---

[8] The lease was admitted into evidence as Exhibit 2.

[9] Defendant testified that Defendant thought that the agreement was between Plaintiff and Defendant, rather than between Defendant and an entity.

[10] These rental rates were contained in the lease, but Defendant had no independent recollection of the rent, specifically.

this $10,000 upon termination of the lease.[11]  The lease also required Defendant to pay a $10,000, refundable, security deposit in monthly installments of $2,000.  The security deposit was refundable "[u]pon satisfaction of Ray's covenants under this agreement."  Defendant admitted that while Defendant paid the entirety of the security deposit, Defendant did not return the cash inventory.  However, Defendant stated that when Defendant was later ejected from the store, see infra, there was cash in the store which Plaintiff could access.

The lease also contained a purchase option.  During the month of August 1997, Defendant had the option to purchase the store for fair market value, or Defendant could extend the lease for another year.

The lease required Defendant to keep financial records and to maintain minimum business hours.  The lease also required Defendant to pay third-party expenses directly, and to pay one-third of Cash Mart's expenses for yellow page advertisements, insurance, California Check Cashing Association membership fees, and bank charges.  Defendant testified that Defendant paid his share of these expenses.

The lease imposed the risk of financial loss on Defendant.  Paragraph 17 of the lease stated:

> 17. Losses: Ray shall bear all of the risk regarding any and all loss of the business including, in particular, losses from bad checks and their prosecution.  Ray shall enjoy one hundred percent of the profits of the business, if any there should be.

---

[11] The lease did not specify to whom the cash inventory should be returned.

In addition, paragraph 18 stated that Defendant and SRA were not "partners, joint venturers, or in any fashion engaged in a common enterprise," and that both Defendant and SRA "shall enjoy their own profit, and suffer their own loss." Paragraph 18 also stated that Defendant and SRA were "free to conduct their business in their own fashion, free of control by the other."

The lease required Defendant to service SRA's Western Union contract and to reimburse SRA for funds received on behalf of Western Union. The lease also required Defendant to ensure payment to Travelers Express -- or any subsequent money order company -- for any money orders the store issued; this could be done by direct payment to the money order company, or by reimbursement to SRA. The lease further required Defendant to accept payments to Pacific Bell ("PacBell"), AT&T, and PG&E, and to deposit the funds into their respective accounts.

The lease contained an indemnification clause. This provision required Defendant to:

> indemnify, defend, and hold harmless SRA, its shareholders, officers and directors . . . against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including attorney's fees, that SRA shall incur or suffer, which arise, result from, or relate to any breach of, or failure by Ray to perform, any representations, warranties, covenants or agreements [in the lease], or as may in any fashion result from the operation of the store by Ray. . . .

Although Defendant read the lease before signing it, Defendant did not understand all of its terms. Defendant believed that he understood most of the lease and its general concept, but there were words he did not understand -- such as "consideration" -- and he did not refer to a dictionary. Defendant did not receive a copy

of the lease in advance of the meeting when he signed it. Defendant signed the lease at the office of Plaintiff's attorney, and recalled that it was the attorney who had prepared the papers.

Defendant understood that the purpose of the lease was to allow Defendant to lease the Camden Avenue store from Plaintiff and to use items at the store. Defendant also understood that Defendant was being given $10,000 to operate the store, but that this was a loan to be repaid; Defendant acknowledged that Defendant never repaid this loan. Defendant also understood that the lease provided Defendant with an option to purchase the store at the termination of the lease.

Defendant thought that the lease provided Defendant a good opportunity, and he was excited to sign the lease. Although Defendant did not know how profitable the store was or how many checks the store cashed each month, Defendant believed that he could profit from the fees paid on various transactions. Such transactions included cashing checks and issuing money orders. However, in this regard, Defendant had no specific expectations as to how profitable the store would be and had no set goals.

Defendant understood in signing the lease that there was no warranty of success, and that any success would depend on Defendant's operation of the business. Plaintiff did not interfere with Defendant's business operations and did not criticize Defendant's method of operating the store. Plaintiff also did not enforce certain aspects of the lease, such as the terms concerning business hours.

Defendant also knew that Defendant was required to operate the business in accordance with the law. However, Defendant did not know what the law was.

With regard to the entire undertaking, Defendant characterized himself as having been "young and stupid." In retrospect, Defendant no longer viewed the lease as having provided an opportunity.

**4. Defendant's Operation of the Camden Avenue Store**

Defendant hired one full-time employee, John Oda, to help run the store.[12] Although the lease required Defendant to pay payroll taxes and worker's compensation taxes for any employees, Defendant did not pay either with respect to Mr. Oda. Defendant acknowledged that, in this regard, Defendant said he "made a mistake." Whenever Mr. Oda worked, Mr. Oda's name was written down along with the hours worked. It was typical for Mr. Oda to open and close the store.

Defendant's own work hours at the store varied. Defendant did not log his own time, but reported that Defendant was there "every day" and that there were many days when both Defendant and Mr. Oda worked together.

Defendant filed a fictitious business name statement with Santa Clara County to have the Cash Mart on Camden Avenue placed under Defendant's name. The application was dated February 11, 1997; Defendant offered no particular reason why he waited five months after entering the lease to file the statement.

---

[12] Exhibit 1, discussed _infra_, shows that there might have been another employee named Fred. However, no testimony was offered concerning anyone named Fred.

1    Part of business operations included the issuance of money

2    orders.  There were machines on site for customers to purchase

3    money orders for a fee.  Defendant understood that it was

4    Defendant's responsibility to ensure that there was money in the

5    business' bank account to cover payments to the money order

6    companies, and that Defendant was responsible for safeguarding the

7    funds received on behalf of the money order companies.  Defendant

8    did not recall if the money order companies would shut down the

9    machines if the companies were not paid.  Defendant acknowledged,

10   however, that if the machines were shut down, then no money orders

11   could be issued and that this would be bad for business.

12   Defendant did not know whether selling money orders was

13   important to the check cashing business, but admitted that the sale

14   of money orders generated cash flow for the business, which was a

15   benefit.  This was because the store was paid a commission on each

16   sale; the amount of the commission was based on a schedule.

17   Defendant thought that at one time, he might have offered no-fee

18   money orders to attract customers.

19   When money orders were sold, a customer provided a sum of

20   money, which would later be deposited into the bank and debited by

21   the money order company.  There was an interim period of time in

22   which Defendant retained possession of the money and could use the

23   money to operate the store.  Defendant did not hold an independent

24   account with Western Union or with the money order company.

25   The business also provided loans to customers.  Customers

26   provided checks -- sometimes post-dated -- to Defendant, who cashed

27   the checks for a fee.  If the customer advised that there were

28   insufficient funds to cover the check, Defendant waited to cash the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

check until the time specified by the customer. These loans were occasionally -- but not always -- accounted for on the store's daily reports, or "dailies."[13]

The dailies reported the store activity for each day, including checks cashed, checks deposited, the starting cash, cash received from various sources (i.e., for PG&E and PacBell transactions), money orders sold, the amount of money transferred through Western Union, fees collected, stamps sold,[14] and lottery tickets sold. The dailies also contained what Defendant referred to as a "z reading," which was the readout from the cash register tape at the end of the day showing the total amount of money which came into the store.[15] Sometimes, transactions occurred after the z reading was taken; these transactions were noted separately on the dailies. The dailies reported miscellaneous charges, including for photocopies, fax charges, and phone cards.

Defendant explained that there were separate cash registers for the PG&E and PacBell transactions, but that money received in these transactions was added to the store's cash. Defendant reported that the store received money on behalf of PG&E and PacBell on an almost daily basis. Defendant could not recall exactly how these transactions were handled, but stated that if the store received a check payable to PG&E or PacBell, those checks were deposited directly into the PG&E or PacBell accounts. Also,

---

[13] Dailies from October 1, 1996 through June 20, 1997 were admitted into evidence as Exhibit 1.

[14] Defendant explained that the store sold stamps as part of its customer service and might not have turned a profit on the stamps.

[15] Defendant explained that if the store sold $10,000 in money orders with $1,000 in fees, the z reading would be $11,000.

if cash received on behalf of PG&E or PacBell was used by the store, Defendant wrote and deposited checks into the PG&E or PacBell accounts to cover such use.

There were also monthly reports.[16]  These reports showed that: gross revenue for October 1996 was $9,115.34; gross revenue for November 1996 was $11,172.45; and gross revenue for December 1996 was $9,998.97.  Originally, the reports were handwritten, but later the reports were typed.  The typed reports were sent by facsimile to Plaintiff on a fax machine which imprinted the incorrect date (April 9, 1994) on the top of each page.

### 5. Defendant's Withdrawal of Funds from the Camden Avenue Store

While leasing the Camden Avenue store, Defendant made several withdrawals of funds from the store.  These withdrawals were noted in the store's dailies as payouts.  Defendant understood that Defendant was allowed to take money as long as the vendors were paid, and stated that Defendant never took any money with the intent of harming Plaintiff.  Defendant insisted that Defendant did not steal any money from Plaintiff.

According to Defendant, while Defendant operated the store and up until the time of his ejection from the store, there was never a time when a vendor went unpaid, nor was there any time when the money order machine was turned off for failure to make a payment.  Defendant stated that any unpaid vendor bills from the end of June 1997 -- after Defendant's ejection from the store -- could not be attributed to the period when Defendant operated the business.

---

[16] The monthly reports were admitted as Exhibit 5.

1  Defendant stated that Defendant has never been presented with any

2  unpaid vendor bill, and denied saddling Plaintiff with any

3  obligations to pay the vendors.

4      Plaintiff called Defendant's attention to a statement in

5  Defendant's trial brief which said that certain vendors were

6  unpaid.  Defendant could not recall if Defendant had ever seen the

7  trial brief, but again stated that to the best of Defendant's

8  recollection, the vendors were always paid.  Defendant believed

9  that the trial brief was incorrect.

10     The dailies showed several payouts to Defendant.  When

11 Defendant withdrew cash from the business, there was a notation of

12 "Ray" or "R" by the withdrawals.  Defendant withdrew substantial

13 sums from the business, including: $700 on October 5, 1996; $3,000

14 on October 7, 1996; $4,000 on October 10, 1996; $2,900 on October

15 11, 1996; $100 on October 12, 1996; $700 on October 15, 1996; $600

16 on October 17, 1996; $900 on October 18, 1996; $300 on October 19,

17 1996; $1,010 on October 22, 1996; $400 on October 24, 1996; $200 on

18 October 25, 1996; and $1,350 on October 26, 1996.[17]

19     The dailies, themselves, showed frequent payouts to Defendant

20 in varying amounts throughout Defendant's operation of the

21 business; the smallest payout was $10 on May 17, 1997, and the

22 largest was $17,000 on May 23, 1997.

23     Occasionally, withdrawals could be attributed to Mr. Oda.

24 Defendant testified that Mr. Oda sometimes needed cash to be

25

26     [17] Plaintiff's initial examination of Defendant on this subject
    ended with payouts made on October 26, 1996.  However, Plaintiff
27  represented that there were 250 payouts to Defendant throughout
    Defendant's operation of the business, and stated that Plaintiff
28  would prepare a chart.  In Plaintiff's own testimony, summarized
    infra, Plaintiff testified at length about the money which
    Defendant withdrew from the business.

advanced from payroll for Mr. Oda's own use.  Also, Defendant

sometimes told Mr. Oda that Defendant needed to deposit money into

the bank, so Mr. Oda wrote, for example, "$3,000 Ray" on the

dailies and gave the cash to Defendant to deposit.

Defendant could not remember what Defendant did with the money

Defendant withdrew.  Defendant surmised that the money might have

been deposited into Defendant's personal bank account, might have

been placed into the business' bank account, might have been used

to pay bills, or might have gone into Defendant's pocket for

personal use, the latter being the most likely scenario for the

smaller withdrawals.  Defendant understood that the store was his,

and that he was permitted to use the money to pay his bills and

rent.  Defendant thought that Defendant took some money to pay

rent, to make car payments, to pay for car insurance, to pay for

medical insurance, to pay credit card debt, and to pay other bills.

Although Defendant could not recall how the money was used with any

specificity, Defendant stated that he was "200% positive" that

Defendant did not keep all of the money that he withdrew for

himself, insisting that sometimes he lent the money to customers,

and that at other times he deposited it into the bank.

With regard to the $4,000 withdrawn on October 10, 1996,

Defendant believed that the funds were deposited into the business'

bank account because of a handwritten annotation;[18] however,

Defendant was not consistent in his annotations.  Defendant agreed

that Defendant did not use the dailies as they were intended, and

that Defendant made the mistake of failing to keep comprehensive

---

[18] The $4,000 withdrawal had the annotation "deposit," not "Ray" or "R."

records.  Defendant believed that any bank deposits would be reflected on the bank statements, and if no deposits were reflected, then it likely meant that Defendant kept the money for his personal use.

Regarding bank deposits, Defendant's practice was to use a calculator to add all of the checks and cash to be deposited, then to attach the calculator tape to the deposit slip.  The deposit slip, itself, did not show which checks were deposited or who wrote the checks; however, the deposit slip did identify what portion of the deposit was for cash or currency, and what portion was attributable to checks.  The calculator tape showed the mathematical calculation, only; Defendant stated that today, Defendant would not be able to look at the tape and identify which checks were included in which deposits.

Defendant was unable to state how much money Defendant took from the store for his personal use, but admitted that "the store wasn't making enough money for my life."  Defendant never attempted to calculate the total amount of money he took for personal use, and was unaware of what his personal expenses were.  Defendant admitted that Defendant did not keep track of all his expenses.

On November 18, 2008, Plaintiff examined Defendant in a deposition.  During the deposition, Defendant admitted to taking money from the store on several occasions.  At trial, Defendant clarified that when Defendant "took" the money, it did not necessarily mean that Defendant pocketed the money for his personal use, only that he had possession of the money.

In addition to using the cash flow resulting from the services provided at the store, Defendant obtained additional cash to

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

operate the business from various sources.  Most of the time,
Defendant obtained cash by withdrawing money from the bank,
including by writing checks to "cash."  Defendant also obtained
cash by writing checks to the other Cash Mart stores.  All requests
by Defendant for cash from the other Cash Mart stores were granted,
none were declined, and all but one of the checks cleared.[19]
However, Defendant did not believe that Plaintiff would have been
willing to cash larger checks, and Defendant did not ask Plaintiff
for more money because Defendant wanted the Camden Avenue store to
be his own.  Defendant also had a friend, Amir Zahedinanfar, who
had another check cashing business and sometimes provided cash.

### 6. Defendant's Option to Purchase the Camden Store

Plaintiff owned a total of three check cashing stores,
including the store which Defendant leased.  Defendant recalled
that approximately eight months into the lease, Plaintiff told
Defendant that Plaintiff planned to sell Plaintiff's other two
check cashing stores.  Plaintiff told Defendant that Plaintiff was
also interested in selling the Camden Avenue store, but Plaintiff
reminded Defendant about the option in the lease for Defendant to
purchase the store.  Defendant had no specific recollection, but
believed that Defendant wanted to exercise the option.  At that
time, Defendant was scared, not making good decisions, and was in a
"bad situation."  The store was not making money, but Defendant did

---

[19] Defendant stated that the only check which bounced was a
check in the amount of $6,000 dated June 11, 1997.  This date is
significant, because as discussed infra, Plaintiff learned about
the check kiting on either June 11 or 12, 1997.

1  not want to give up the store.  Ultimately, as explained <u>infra</u>,
2  Defendant did not purchase the store.

3

4                **7. Defendant's Check Kiting Activities**

5       When Defendant's business was doing poorly, Defendant decided
6  to start kiting checks to create the illusion that there was money
7  in the business and to "buy time."  Defendant kited checks because
8  he did not have sufficient money to do business otherwise;
9  Defendant stated that his intent was to keep the business going,
10 not to harm the business or Plaintiff.  Defendant testified that he
11 kited checks because he did not believe that Plaintiff would give
12 Defendant the large sum of money which Defendant needed to operate
13 the business.  Defendant kited whatever money he needed for himself
14 and for the store.  When asked, Defendant denied that Defendant
15 kited money to "siphon money from the business."

16      At trial, Defendant was asked by Plaintiff whether Defendant
17 knew that check kiting was illegal.  Defendant testified that he
18 "found out later" that check kiting is illegal.  No further
19 testimony was elicited from Defendant on this point.

20      Defendant used two separate bank accounts; the first was an
21 account with Wells Fargo Bank which had been opened by SRA, and the
22 second was an account which Defendant opened with the Bank of Santa
23 Clara for the business, ostensibly because the Bank of Santa Clara
24 offered a better interest rate.  Defendant was an authorized user
25 on the Wells Fargo Account and was the only person who used the
26 account, but the account was not his, and Plaintiff had access to
27 it.  Defendant wrote checks on the Wells Fargo account, and used
28 the account only to conduct Cash Mart business.  By contrast,

Defendant had full control over the Santa Clara account, and
Plaintiff was not a signatory on the Santa Clara account.
Defendant stated that while Defendant operated the store, Defendant
received the bank statements for both accounts and performed the
reconciliations each month.

Defendant's testimony was inconsistent with regard to
Defendant's purpose for opening the Santa Clara account. Early in
his testimony, Defendant admitted that Defendant opened the Santa
Clara account in February 1997 for the purpose of kiting checks.
However, Defendant later testified that when Defendant opened the
Santa Clara account, it was not Defendant's original intention to
kite checks.

The reason Defendant was authorized to use the Wells Fargo
account was because Defendant needed to make deposits to cover
amounts owed to Western Union and for money orders. The money
order company withdrew money from the Wells Fargo account twice per
week through an automatic withdrawal; money order sales for Mondays
through Wednesdays were debited by the money order company on
Thursdays, and sales for Thursdays through Sundays were debited on
Mondays. Western Union determined how much to deduct by reading
its machine through a telephone line to determine how many money
orders were sold; Western Union debited funds every day except for
Saturday and Sunday. At some point, these deductions were switched
from the Wells Fargo account to the Santa Clara account. Defendant
could not recall how he performed this switch, but stated that the
switch was made after Plaintiff approved it.

Until the debits were made, the money collected by the store
for money orders and Western Union orders was mingled with the

store's other funds.  The money was included in the business' cash flow and was not kept separate.

It was Plaintiff who showed Defendant how to open a business account; Defendant used this knowledge to open the Santa Clara account on his own.  Defendant eventually disclosed the Santa Clara account to Plaintiff, yet for reasons which are not clear, Plaintiff did not take any steps to close the Wells Fargo account, which remained open after such disclosure, even though the business did not actually need the Wells Fargo account to operate. Defendant continued to use the Wells Fargo account until Defendant was ejected from the business.

Defendant claimed that he was in "over his head" and described check kiting as his "way out of it."  Defendant did not believe that kiting was stealing; he characterized it as "buying time for the cash flow."  Defendant acknowledged that Defendant had "made bad business choices," had "screwed up," had taken things "too far," and did not know what he was doing.

Defendant wrote several bogus checks which he endorsed with fictitious names, then deposited them.[20]  These included: a check for $18,425 to the fictitious name Gary Park drawn from the Santa Clara account -- this check was not cashed because of a stop payment order; a check for $16,750 to Gary Park drawn from the Wells Fargo account; a check for $8,900 to the fictitious name Richard Stein drawn from the Wells Fargo account; a check for $42,000 to Cash Mart drawn from the Wells Fargo account; a check

---

[20] These checks were included in Exhibit 6, which was admitted into evidence.  At trial, Defendant identified which checks in Exhibit 6 were part of the check kiting, which might not have been involved in the check kiting, and which were duplicates of other checks included in the exhibit.  There were numerous duplicates.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

for $10,000 to Money Market drawn from the Wells Fargo account; a check for $13,000 to Money Market drawn from the Wells Fargo account; and a check for $6,000 to Hamid Razavi[21] drawn from the Wells Fargo account. Defendant separately testified that another check in the amount of $38,000 payable to the fictitious name Robert Burk was part of the check kiting scheme.

Defendant also admitted that Defendant forged a check from Defendant's mother's account and signed it without her permission as part of the check kiting. The check was a credit card check; Defendant deposited it into the Wells Fargo account but the check was returned unpaid. When Defendant wrote the check, he knew that there was no money in the account, but he wrote the check to create a cash flow.

### 8. Ejection of Defendant from the Store

Defendant operated the Camden Avenue store without interference by Plaintiff from October 1996 through the first ten or eleven days of June 1997. At that time, Plaintiff ejected Defendant from the store. Plaintiff did not allow Defendant to enter the store, took Defendant's keys, and told the employees not to let Defendant enter. Defendant could not recall when his last actual day in the store occurred, although his handwriting appeared on a close-out sheet for June 17.

When Defendant was ejected from the store, Defendant left with no money. Plaintiff obtained control over, and possession of, the

---

[21] Hamid Razavi is Defendant's cousin. However, Defendant admitted that this was a bogus check. Defendant could not recall any instance in which Defendant gave Hamid Razavi any money from Cash Mart.

cash left in the store, as well as over all financial records which remained on the premises. Defendant lost his ability to make car payments, and his car was repossessed.

Defendant recalled that the Wells Fargo account was frozen when Defendant was ejected from the store. Defendant believed that the Santa Clara account was not overdrawn at that time. However, Plaintiff examined Defendant on two exhibits: a check register from the Bank of Santa Clara, and bank statements for Defendant's account with the Bank of Santa Clara. The check register demonstrated that the account balance dipped below zero on June 7, 1997, recovered to a positive balance on June 9, 1997, then again dropped below zero on June 12, 1997.

Defendant believed that the eviction was wrongful, but Defendant decided not to take any action because Defendant had made a lot of mistakes and felt bad about what had happened.

Shortly after being ejected from the store, Defendant enlisted the help of Joe Fathi, a family friend, to mediate with Plaintiff. Defendant and Mr. Fathi went to Plaintiff's office to see if they could reach a resolution with Plaintiff. Defendant knew that Defendant had created a financial problem with the store, mainly because of the check kiting. Defendant was scared because Plaintiff had told Defendant that Plaintiff would put Defendant in jail. At the meeting, Defendant offered to pay Plaintiff in installments, but Plaintiff insisted on a lump sum payment.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

### 9. Criminal Investigation

Defendant testified about a criminal investigation into Defendant's check kiting activities. Defendant was convinced that Plaintiff had put pressure on the police and on an ex-prosecutor to pursue criminal charges over a period of about two years.

Defendant had no specific memory of the incident report generated by the Office of the Santa Clara County Sheriff. Defendant could not recall what statements Defendant made to the investigating officer, including any statements about Gary Park or Richard Stein. Defendant also could not recall what statements Defendant made to the officer about the purpose of any of the kited checks. However, Defendant admitted that the statements in the police report were generally true as to what Defendant told the officer; Defendant simply could not recall the specifics.

The incident report was admitted into evidence, but not for the truth of any statements it contained. The report, itelf, indicates that Plaintiff initiated the report on July 3, 1997, claiming theft and embezzlement by Defendant from SRA.[22]

Defendant was placed in jail for 10 days, which was a source of embarassment for him because Defendant's father had been a police officer and his uncle had served as a superior court judge.

### 10. Defendant's Aviation Education

Defendant did not recall ever telling Plaintiff that Defendant wanted to go to school full time. However, Defendant had an

---

[22] The outcome of the criminal proceeding was not offered or admitted in evidence. According to Plaintiff's testimony, the police investigation did not "go forward" because Defendant stopped cooperating. It appears that the charges might have been dropped, but there was no evidence in this regard.

interest in piloting airplanes which had been kindled in the early 1990's when Defendant was a passenger in a private plane.

Starting in 1996 or 1997, and while Defendant was working at Cash Mart, Defendant began taking flight lessons in pursuit of FAA-issued licenses. When he started flight school, Defendant was already having financial problems.

Defendant started his flight instruction at Squadron 2. Lessons consisted of classroom (ground school) and in-plane instruction. At each lesson, there was an hour to 90 minutes of instruction and planning, followed by an actual flight of another hour to 90 minutes. Defendant took lessons at least once or twice per week, but might have gone more frequently.

Defendant could not recall the exact cost of the instruction but wanted to keep track of the cost. It cost slightly more than $8,000 to obtain a private license.[23] Defendant thought that he paid for the lessons by check or cash, and could not recall ever paying for a lesson with a money order. It took about six to eight months to obtain the private license.

The private license allowed Defendant to fly a single engine airplane by himself. However, Defendant wanted to obtain other licenses, so he logged flight time by flying planes owned or leased by the flight school. Defendant went flying once or twice per week -- sometimes three times per week -- for one to two hours at a time. Defendant paid approximately $45 to $60 per hour, inclusive of fuel, to fly the planes. At times, Defendant was a passenger in

---

[23] During his deposition, Defendant testified that the cost was likely between $3,000 and $5,000, but at that time, Defendant could not recall the exact cost.

planes piloted by other students, where he observed other students'
instruction.

After Defendant worked at Cash Mart, Defendant pursued other
licenses in addition to the private license. First, Defendant
obtained an instrument rating, which allowed Defendant to fly in
the clouds. To obtain an instrument rating, Defendant attended
additional instruction at either Squadron 2 or Tradewinds.
Defendant did not attend both flight schools at the same time and
could not recall the exact cost, but said that it cost less than
$8,000 to obtain the instrument rating. The instructors charged
about $20 to $25 per hour, and there was the additional cost of $45
to $60 per hour to rent the plane. It took only a few months for
Defendant to obtain an instrument rating. Defendant did not need
to complete any minimum number of hours to obtain this rating, but
instead simply needed to be able to perform certain maneuvers.

Defendant then pursued additional licenses. It took a year,
perhaps less, for Defendant to obtain a commercial license, which
also allowed Defendant to become a flight instructor. In contrast
with the instrument rating, there was a requirement that Defendant
complete 250 hours of flight time to obtain the commercial license;
Defendant was able to credit time spent in the air obtaining the
private license toward these hours. Defendant sometimes flew with
an instructor, but could also fly alone.

Simultaneously with pursuit of the commercial license,
Defendant also obtained a multi-engine license, which allowed him
to fly planes with more than one engine. Defendant explained that
the test for commerical and multi-engine licenses is a single test
which results in two distinct licenses, with written and practical

components.  However, the multi-engine license did not require any minimum flight time.

Defendant could not recall the cost of obtaining the commercial license, but knew it was less than $8,000.  Defendant stated that $8,000 was the most Defendant ever spent on any license, and that the private license was the hardest to obtain.

To complete 250 hours of flight time, Defendant necessarily would have spent between $11,250 and $15,000 on plane rental alone. Per Defendant's testimony, the cost of renting the plane was between $45 and $60 per hour.[24]

Defendant then obtained an instructor license.  There was additional training and an exam; the training took less than a year.  To be an instructor, Defendant needed to be able to fly the plane while sitting in either of two seats.  Defendant could not recall how much money he spent to obtain the instructor license, but was certain that it was less than $8,000.  Defendant obtained an instructor license in the late 1990's or early 2000's; the license must be renewed every two years.

Defendant testified that Defendant did not enter the lease for the purpose of obtaining money to finance Defendant's flight school.  However, Defendant did not explain where or how Defendant obtained the money to pay for his instruction.

---

[24] The Court notes that if the rental cost were $45 per hour, then it would have cost $11,250 to rent a plane for 250 hours, excluding any fees paid to an instructor.  If the rental cost were $60 per hour, it would have cost $15,000, excluding instructor fees.

### 11. Cigars 'N More

In 1997, Defendant purchased a smoke shop on Winchester Boulevard in San Jose.  The business was called Cigars 'N More; Defendant purchased the business with another individual named Kam Haghi, who at that time was Defendant's friend.  Defendant filed a fictitious business statement for the smoke shop on April 7, 1997. Defendant recalled that it cost approximately $27,000 to buy this business; Defendant did not testify as to the source of the purchase funds.  At some point, Defendant decided to transfer his ownership interest in the store to Mr. Haghi because Defendant was in a poor financial situation, was not doing a good job with the Camden Avenue store, and was kiting checks.  Defendant could not recall any instance in which Mr. Haghi provided cash to Defendant.

Plaintiff sued Defendant and Mr. Haghi as co-defendants in a lawsuit.  Defendant could not recall the specifics of the case, but recalled that Plaintiff obtained a default judgment against Defendant for more than $182,000.  Defendant also recalled a trial against Mr. Haghi in which Defendant invoked the Fifth Amendment and declined to testify.  Defendant was unsuccessful in an effort to vacate the default judgment.

### 12. Defendant's Post-Cash Mart Employment

Defendant could not recall, specifically, where Defendant was working while Defendant pursued the commercial license.  However, after Defendant left Cash Mart, he worked at another check cashing store off of highway 101.  Defendant specifically recalled working at a check cashing store called Check Express on Julian Street, which is where Defendant was working when Defendant was arrested on

criminal charges, as discussed _supra_. Defendant recalled that Plaintiff was present at the time of Defendant's arrest, which might have taken place in 1998.

At Check Express, Defendant was paid an hourly rate and earned approximately $1,500 to $2,000 per month. At that time, Defendant lived in a two-bedroom apartment in San Jose off of Saratoga Avenue with his grandmother.[25] Defendant could not recall the exact rate of rent, but thought it was somewhere between $1,200 and $1,500 per month. Defendant's grandmother did not work but helped with the rent to a minimal extent.

When Defendant obtained his instructor license, he was working part-time at ACM Aviation on the tarmac. Defendant could not recall how much money Defendant was paid at ACM; it was an hourly job, and Defendant thought he earned between $500 and $1,000 per month.

While working at ACM, Defendant was also attending San Jose State University to finish his degree. At the time, Defendant lived in an apartment in Campbell with a roommate.[26] Defendant could not recall the amount of the rent, but thought that his share was around $600 to $700 per month. Defendant also was paying tuition at the time, but could not recall the amount. Defendant stated that Defendant received some financial aid from the school, but again could not remember how much. Defendant did not obtain a

---

[25] Defendant's testimony about the location of his residence after he left Cash Mart was unclear and confusing. Defendant also testified that he left his apartment in Campbell after June 1997 and mentioned that he lived with his parents for part of the time.

[26] See footnote 25.

student loan, but purchased discounted books and paid a reduced tuition.

While attending the university, Defendant owned a car -- a Ford pickup truck -- and paid for insurance on it. Defendant had a monthly car payment. Defendant's parents helped him, financially; his mother, who at that time worked (and continues to work) as a preschool teacher, sent him money. Defendant also believed that his father worked at Whole Foods while Defendant was attending college. Occasionally, Defendant reciprocated and provided aid to his parents, and did not know how much money either of his parents earned in their respective jobs.

After obtaining his instructor license, Defendant began to provide flight instruction. In doing so, Defendant earned between $15 and $20 per hour for approximately eight to twelve hours per week. Defendant believed that he earned about $200 to $250 per week before taxes, but could not recall his net earnings. Defendant thought that the net earnings might have been between $600 and $800 per month.

Defendant began to work as a pilot for V1 Aviation. Business was slow, and he was laid off. While at V1 Aviation, Defendant's starting salary was around $50,000, and his ending salary was around $70,000. Defendant could not recall how many hours he worked at V1 Aviation, or what his work schedule was.

Defendant now works as a pilot with a company called XOJet, where he has worked since 2010. At the time of his testimony, Defendant had worked there for almost four years; Defendant reported that he "works 8 days on and 6 days off." At XOJet, Defendant flies multi-engine (two engine) planes which are rated

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

for two pilots per plane. According to Defendant, XOJet employs approximately 170 pilots. Defendant's starting salary at XOJet was $52,200, but as of the time of Defendant's testimony, Defendant's salary had risen to $93,000 for full-time piloting work.[27] This was Defendant's gross income, before taxes and deductions. Defendant no longer teaches flight instruction.

### 13. Defendant's Poor Memory of Events

Most of the pertinent events happened almost two decades ago in 1996 and 1997. Throughout his testimony, Defendant had some difficulty in recalling specific facts and dates. For instance, Defendant could not recall the exact year when Defendant went to work for Plaintiff, or how long Defendant was Plaintiff's employee. Also, Defendant thought it was possible that he left Cash Mart before getting married and believed that he left Cash Mart in 1997. When asked about a gentleman named Sohrab, Defendant had no recollection. Defendant stated that he thinks his memory was better in 2008 -- when he was deposed -- than it is now for events which happened 10 or more years ago. Defendant agreed that there could be a problem with his memory, although he had not been diagnosed with any medical condition.

---

[27] When Defendant's wife filed her bankruptcy petition in 2011, she inexplicably listed Defendant's income as $1,950 in unemployment compensation. Defendant could not explain why his wife listed this erroneous information.

**B. Plaintiff's Testimony**

Plaintiff Michael Zamani[28] also testified at trial. While Plaintiff testified about many of the same subjects as Defendant, Plaintiff remembered the events somewhat differently from Defendant, and Plaintiff's testimony was sometimes different.

**1. Plaintiff's Business Operations**

Plaintiff was a successful businessman who owned and operated several different businesses in different industries. In 1987, Plaintiff started a direct mail and printing company located on The Alameda in San Jose. A few months after Plaintiff opened this business, a pair of Iranian brothers -- the Roohparvars -- opened a grocery store across the street. Plaintiff and the Roohparvars became friends.

Plaintiff also operated a hair salon on the Almaden Expressway in San Jose. In 1990, Plaintiff leased an entire building on Race Street in San Jose. The building contained four store fronts, and Plaintiff opened a second salon, which he called Sharper Cuts. Plaintiff leased two of the other store fronts to a karate school, and he leased the fourth space to a friend who ran an alterations business. The alterations business eventually vacated the premises, and Plaintiff was unable to obtain a replacement tenant.[29]

Plaintiff met Defendant while Defendant was working for the Roohparvars. Plaintiff used to buy coffee and doughnuts at the

---

[28] Plaintiff's birth name was Akbar Jaffari Zamani, but he calls himself Michael.

[29] Somewhat inconsistently, Plaintiff also testified that Plaintiff could have rented the store front from $1,300 to $1,500 per month.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

store, and Plaintiff and Defendant also became friends.  At some point, the Roohparvars opened a check cashing store in the same shopping strip where the grocery store was located.

In 1995, Plaintiff decided to open some check cashing stores of his own.  Plaintiff consulted with Ron Roohparvar about a potential business site on Camden Avenue.  Ron Roohparvar advised that the location was excellent.  With the Roohparvars' help, Plaintiff set up the business, obtained approval to issue money orders and Western Union transfers, and opened bank accounts, including an account at Wells Fargo.[30]

Plaintiff incorporated the business under the name SRA, with himself as the sole shareholder, for the purpose of opening a check cashing store.  Plaintiff explained that it is Plaintiff's practice to incorporate every business that he opens.  Plaintiff named SRA after his three children: Shannon, Ryan, and Allison.

Plaintiff decided to name the business Cash Mart.  Plaintiff filed a fictitious business statement on May 18, 1995, registering the business with Santa Clara County, and listing SRA as the registrant.

Business at Cash Mart was good; Plaintiff hired a friend to run the business.  Plaintiff sometimes visited the business, but Plaintiff was not there on a regular basis.  Plaintiff hired another Persian man named Sohrab to help run the store.  Sohrab

---

[30] Plaintiff stated that banks generally do not want to open accounts for check cashing businesses, because such businesses are high risk.  Plaintiff stated that Plaintiff had other accounts with Wells Fargo, including a line of credit, which is why Plaintiff believes he was successful in opening an account for the business at Wells Fargo.

worked six days per week, from open to close. Plaintiff also hired the 18-year old son of a friend to help with the business.

In December 1995, Plaintiff decided to open a second location on Saratoga Avenue in San Jose. As previously, Plaintiff sought Ron Roohparvar's advice as to the suitability of the location. Ron Roohparvar advised that the location was excellent. Plaintiff then opened a check cashing store at that location and hired people to operate it.

In February 1997, Plaintiff decided to open a third check cashing store in the vacant storefront Plaintiff was already leasing on Race Street. The Roohparvars were upset and did not want Plaintiff to open the store, and Plaintiff thought that the Roohparvars were being unreasonable because, in Plaintiff's opinion, the store would not directly compete with the Roohparvars' check cashing business. Plaintiff stated that the two businesses were approximately 16 to 18 blocks apart, in different neighborhoods.[31]

Plaintiff was still on speaking terms with Defendant at that time. Plaintiff knew that Defendant was working for the Roohparvars and was running a check cashing store in Gilroy inside of an ethnic grocery store. When Defendant came to San Jose, Defendant sometimes visited Plaintiff. During one visit in April 1996, Defendant visited Plaintiff at Plaintiff's office on The Alameda and informed Plaintiff that Defendant was no longer working for the Roohparvars. Defendant told Plaintiff that the Roohparvars

---

[31] There was no testimony about the specific addresses of the two stores. As a result, the Court is unable to determine the exact distance between the stores.

did not pay Defendant enough money and had not kept their promises, and Defendant was not happy with the commute.

Plaintiff knew that Defendant had supervised four or five Money Market stores and that Defendant had been left in charge of the stores when the Roohparvars traveled to Iran. Plaintiff had been very busy with all of his businesses -- working 12 hours per day, six days per week -- and saw an opportunity to hire Defendant.

### 2. Defendant's Employment by Plaintiff and Subsequent Lease of the Camden Avenue Store

Plaintiff offered Defendant a job for $2,500 per month to supervise Plaintiff's three check cashing stores. There was no employment contract, but Plaintiff put Defendant on the payroll.

Defendant was in charge of the store located on The Alameda; other individuals ran the other two stores. Every evening, the other two individuals brought daily close-out sheets to Defendant, who then provided cash for the other two stores to operate.

A few months after hiring Defendant, Plaintiff realized that Defendant could not be given a lot of freedom to move between the stores, because "in between he play[ed] off" and "slacked off." Plaintiff sometimes phoned the stores to speak with Defendant, but Defendant was not present at any location and could be missing for as many as two hours. Plaintiff spoke with Defendant about this issue and counseled Defendant that Plaintiff was expecting performance, and Defendant should "shape up or ship out."

Defendant then asked Plaintiff if Defendant could lease the Camden Avenue store while Defendant attended school. Plaintiff gave the idea some thought. Plaintiff knew that Defendant knew more about the stores than Plaintiff did; that Defendant did not have

any money or credit; and that Defendant would not be able to get credit from Western Union or the money order company, which were very strict about who could have access to their machines and required payment of a bond.

Nothwithstanding Defendant's lack of credit, Plaintiff decided to help Defendant, because other people had given Plaintiff an opportunity to succeed after Plaintiff immigrated to the United States. To this end, Plaintiff opened a separate bank account at Wells Fargo for SRA, and told Defendant that Defendant could use that account for the Camden Avenue store. Plaintiff added Defendant as an authorized signatory on the account. Plaintiff also gave $10,000 to Defendant to operate the business, with the expectation that this sum would someday be repaid. Plaintiff believed that $10,000 would be a sufficient amount of money to get Defendant started in his business, because check cashing stores operate off of the cash float.

Plaintiff explained that there was a trust agreement between SRA and the money order company, and Plaintiff was a trustee. Like Defendant, Plaintiff confirmed that money orders can be sold seven days per week, but the money order companies only debit funds twice per week. Plaintiff stated, somewhat differently than Defendant,[32] that Western Union debited funds three to four times per week.

Plaintiff also confirmed that the stores received payments on behalf of PacBell, AT&T, and PG&E; the contracts to collect such funds remained with SRA and were not assigned to Defendant. Any funds collected for these three companies was to be deposited into

[32] Defendant's testimony suggested that Western Union debited funds every day except for Saturdays and Sundays. However, Defendant's memory was foggy in several respects.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

a special account for each company, and there were separate tills for cash received on behalf of PacBell and PG&E. PacBell maintained a computer at the store, where customers could pay their bills -- in whole or in part -- by cash or check, with the store receiving a 25-cent commission on each transaction. Any checks received at the store were endorsed by a machine then stored in a box. If, on any particular day, a store was short on operating cash, then the store would make use of the cash received in these transactions and someone would write a check on behalf of the store to cover such amount.

Plaintiff stated that Plaintiff remained a guarantor of all of SRA's contracts, and Plaintiff and his then-wife, Nancy Zamani, personally guaranteed SRA's debt. However, none of the contracts were offered into evidence.[33]

When Defendant leased the Camden Avenue store, Plaintiff knew that Defendant intended to attend school. However, Plaintiff was unaware that Defendant intended to attend flight school.

Plaintiff's lawyer prepared the lease. Defendant reviewed the lease and objected to a few terms, which were then crossed out before Defendant signed the lease. Plaintiff handed the store over to Defendant on October 1, 1996. Plaintiff knew that Defendant had hired Mr. Oda to work at the store;[34] Plaintiff believed that Mr. Oda is now deceased.

---

[33] When asked if Plaintiff had a copy of the contract with PacBell, Plaintiff responded that he did not have a copy of the agreement.

[34] At one point, Plaintiff testified that Defendant was not supposed to have any employees. This testimony did not make sense in the context of Plaintiff's other testimony. In addition, the lease stated that the business was to remain open 65 hours per week.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Defendant sent monthly financial reports to Plaintiff.  These were sent by facsimile from an old machine Plaintiff had provided to Defendant; Defendant had not changed the date on the machine, so all of the transmissions were dated April 9, 1994.  Plaintiff knew about -- in fact, Plaintiff designed -- the dailies, but did not receive the dailies until after Defendant was ejected from the business.

Plaintiff believed that Defendant's business was going well. Defendant had been making all monthly payments, including rent payments of $2,500 per month,[35] and had also paid Defendant's portion of the shared expenses for yellow pages and insurance, which was approximately $500 per month.  Pertinent bank statements had been sent to the Camden Avenue store -- not to Plaintiff -- to allow Defendant to perform any reconciliation.

Defendant sometimes asked Plaintiff for cash to operate the business.  In early 1997, Defendant told Plaintiff that the business had "grown up" and that Defendant needed operating cash. Plaintiff agreed to provide the cash in exchange for checks, as long as Defendant paid the processing fee of $2 for every $1,000. Sometimes Defendant wanted a lot of cash (i.e., $20,000), but Defendant paid the money back.  Defendant obtained the cash from any of Plaintiff's other Cash Mart stores, depending upon which stores had sufficient cash on hand.  If a store fell low on cash, Plaintiff sent a driver to move cash between the Plaintiff's stores.

The cash which Defendant received from Plaintiff was logged into the dailies.  The source was identified as CM2 or CM3,

---

[35] The highest rent specified in the lease was only $2,200.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

depending on the store from which the cash originated.[36]  Plaintiff did not think these requests for cash were out of the ordinary, because the very nature of the check cashing business required a cash flow.

### 3. Defendant's Financial Problems and Check Kiting

Plaintiff did not know about Defendant's financial problems until June 11 or 12, 1997.[37]  That morning, Plaintiff received a phone call advising that SRA's account at Wells Fargo had been frozen.  Plaintiff contacted Wells Fargo's Loss Control Department and spoke with Ivan.  Ivan told Plaintiff about suspicious check kiting activity on the account which Defendant had been using.

That same day, Plaintiff phoned Defendant, but Defendant was not in the store.  Plaintiff went to the store; Mr. Oda was at the store, but Defendant had not arrived yet.  Plaintiff instructed Mr. Oda not to let Defendant into the store or behind the counter until after Plaintiff could talk with Defendant.  Plaintiff changed the locks and gave the new key to Mr. Oda.  A couple of hours later, Defendant phoned Plaintiff to ask what was happening.  Plaintiff responded, "You tell me," then told Defendant about the frozen accounts, and confronted Defendant about the check kiting. Defendant denied any wrongdoing.

---

[36] The Camden Avenue store was CM1.  CM2 was the store on Saratoga Avenue, and CM3 was the store on Race Street.  For example, the daily report for May 30, 1997, reflects $20,000 in cash received from "CM#3."

[37] At first, Plaintiff testified that these events occurred on June 11, 1997.  He later testified that the events actually occurred a day later on June 12, 1997.

1    Plaintiff then called the bank, took responsibility for the

2    losses, and asked for permission to deposit checks.  Wells Fargo

3    agreed, but Plaintiff was not able to withdraw any money until the

4    checks cleared.  Plaintiff did not know how much money the bank --

5    or Plaintiff -- had lost because of the check kiting.  However,

6    Plaintiff was able to determine that the check kiting began in

7    February 1997.

8       Plaintiff did not believe that Defendant needed to kite checks

9    in order to operate the business.  According to Plaintiff, there

10   was ample float from the sale of Western Union transfers and money

11   orders to have cash on hand to operate the business.

12      Plaintiff stopped payment on two of the kited checks.  As to

13   two other kited checks, Plaintiff testified that Plaintiff "had to

14   pay" to cover the checks, and that Plaintiff "had to clean up"

15   after Defendant.  These were the $8,900 check payable to Richard

16   Stein, and the $16,750 check payable to Gary Park.  Plaintiff did

17   not explain or offer any document or any other evidence

18   demonstrating why Plaintiff felt that he was required to pay for

19   these two checks.

20      Plaintiff stated that Plaintiff also made payments to Western

21   Union and to the other companies which were owed money by the

22   Camden Avenue store.  The amounts of these alleged payments are

23   discussed <u>infra</u>.  However, Plaintiff offered no documentary

24   evidence to corroborate that such payments were, in fact, made, or

25   documents reflecting the amounts of any such payments.  Plaintiff

26   testified that in making these payments, Plaintiff did not require

27   Defendant to sign a promissory note.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

In retrospect, Plaintiff realized that Defendant had asked for larger amounts of cash approaching June 11, 1997. When Defendant had asked for the cash, Plaintiff had thought that it was a sign that Defendant's business was going well.

Plaintiff's testimony about Defendant's ejection from the business was a bit confusing. At first, Plaintiff testified that Defendant was locked out of the business immediately after Plaintiff learned about the check kiting. Plaintiff later testified that Plaintiff allowed Defendant to stay for another week and that Defendant did not leave the store until June 17, because Plaintiff thought that Plaintiff could reach a resolution with Defendant. Plaintiff also testified that the last day Defendant operated the store was June 11 or 12, but that it was possible that Defendant assisted with debits for the money order company after June 12.

### 4. The Sale of Plaintiff's Businesses

While Defendant was leasing the Camden Avenue store, Plaintiff was distracted by a personal matter. In March 1997, Plaintiff and his wife separated. Plaintiff decided to sell all of his businesses and hired a business broker. Plaintiff sold both salons in March 1997 to the managers of each salon. Plaintiff required no down payments, and viewed himself as a philanthropist; one of the salon managers was a Mexican woman who Plaintiff believed would never have been able to own her own business, and the other manager had been married to a sheriff's deputy who had drowned in Hawaii.

Plaintiff sold the printing company in August 1997, but did not sell the underlying real estate and continued in the role of

landlord.  Plaintiff also decided to sell the check cashing stores,
but because Defendant had an option to buy the Camden Avenue store,
Plaintiff wanted to talk to Defendant before selling the stores.
Plaintiff visited Defendant in May 1997 and explained the
situation, but did not disclose Plaintiff's separation from his
wife.  During that conversation, Defendant expressed an interest in
buying the store, so Plaintiff told the business broker that only
two stores were to be sold.

Plaintiff found a buyer for the two stores.  The sale was set
to close at the end of June 1997.  However, in Plaintiff's opinion,
the freezing of SRA's accounts on June 11, 1997, "was the death of
the store."  Plaintiff was upset and scared.  However, Plaintiff
salvaged the situation and was able to close escrow on all three
stores -- including the Camden Avenue store -- at the end of June
for a total sales price of $290,000.

### 5. The Meeting with Joe Fathi

After the events of June 11 or 12, 1997, Defendant visited
Plaintiff in Plaintiff's office with Joe Fathi.  Joe Fathi was an
old friend of Plaintiff.  At that time, Plaintiff was angry with
Defendant.  Mr. Fathi told Plaintiff that Defendant knew that
Defendant had made a mistake, but wanted to make good on it.
Defendant said that about $40,000 was involved, but Plaintiff
wanted to conduct his own investigation to determine the extent of
the loss.

During that visit, Plaintiff stated his unwillingness to
accept a monthly payment from Defendant.  Plaintiff did not know
how much money was involved, and did not want to turn Defendant's

"embezzlement into a loan." Plaintiff wanted Defendant to provide some proof as to how Defendant would make payment. Plaintiff later learned that more than $40,000 was involved. By Plaintiff's calculation, the sum was closer to $182,000.

Included in this sum were amounts that Plaintiff claimed to have paid after Defendant was ejected from the business. Relying on his memory, Plaintiff recalled making the following payments: $78,067.33 to IPS, a money order company; $31,266.97 to Western Union; $52,500 to PacBell; $23,100 total to PG&E and AT&T; $917.02 for phone cards; $1,544.12 owed to Mr. Oda for wages; $1,210.84 for the State Lottery; and $2,500 for a bounced check to the landlord. While this was Plaintiff's testimony and recollection, Plaintiff had no bank records or documents to corroborate his testimony, and admitted that Plaintiff never contacted PG&E or Western Union to request any records. Rather, Plaintiff admitted that, to the extent he ever had any relevant documents, such documents had been discarded by him voluntarily.

Regarding the $1,210.84 paid to the State Lottery, a bill entitled "Final Notice" from the State Lottery for this amount was admitted into evidence. According to Plaintiff, Plaintiff paid this bill shortly after receiving it. However, Plaintiff acknowledged that while the contract was between SRA and the State Lottery, Plaintiff had not personally guaranteed this obligation.

Notwithstanding Plaintiff's knowledge that Defendant had mishandled the store's finances, Plaintiff continued to entrust Defendant with large sums of money. Plaintiff claimed that Plaintiff allowed Defendant to handle $40,000 on June 18 because

Defendant "was cooperating."[38] Plaintiff also testified that Plaintiff still trusted Defendant to handle checks, because Plaintiff thought that the losses were limited to $40,000. Plaintiff stated that Plaintiff had "one mission" at that time: to save and sell the stores. After June 12, Plaintiff viewed Defendant as a "strawman" who could make deposits and withdrawals, but who lacked a key to the store. Plaintiff agreed that between June 12 and 17, approximately $150,000 was deposited from the operation of the store.

Plaintiff was very concerned about various withdrawals of money which Defendant had made from the business during and after October 1996, particularly the payouts reflected in the dailies.[39] In Plaintiff's view, Defendant was not entitled to take any money out of the business for personal use, and Defendant's income was limited to store revenue minus expenses. Plaintiff stated that the entire store's revenue "was not even close to the amount of money" which Defendant withdrew from the business, and that Defendant had taken more money out than the store had grossed. At first, Plaintiff was not able to reconstruct the exact sum to which Plaintiff thought Defendant would have been entitled, although

[38] Plaintiff's testimony about this sum was confusing. Plaintiff testified that Plaintiff wrote a check in this amount from the Wells Fargo account and deposited it into the Santa Clara account on June 18. Plaintiff stated that the check cleared two days later on June 20. Plaintiff stated that Plaintiff made this deposit "to make sure that nothing gets rejected" until the businesses could be sold. However, cross-examination revealed that there was a credit of $40,000 into another account, and Plaintiff did not have any records to show that the $40,000 was ever deposited into the Santa Clara account.

[39] Plaintiff testified in significant detail about the payouts reflected in Exhibit 1, which speaks for itself.

Plaintiff thought that Plaintiff could estimate the amount, based on Plaintiff's experience.  Later, Plaintiff testified that the net income to which Defendant would have been entitled between October 1996 and June 1997 was only $18,086.

On cross-examination, it became evident that while Plaintiff counted the payouts listed in the dailies against Defendant as having been for personal use -- including ambiguous payouts which were not specified as having gone to Defendant -- Plaintiff did not give Defendant any credit for deposits made into the business.  The dailies reflected numerous cash deposits from different sources, including from the bank and from Defendant, in the many thousands of dollars, but Plaintiff did not give Defendant any credit for these deposits.  When asked why, Plaintiff explained that, in his opinion, the money did not come from Defendant, because Plaintiff "ran the business" and was "his boss."  Plaintiff also speculated that some of the money designated as being from Defendant may have derived from bounced checks; however, Plaintiff could not point to specific evidence that this was the case.  Plaintiff explained that when a check bounced, the store tried to work with the customers to recover the funds.

As to some of Defendant's withdrawals, Plaintiff could not say for certain whether Defendant included those funds in any bank deposits.  As to others, Plaintiff initially expressed certainty that the funds were not deposited, but admitted that Plaintiff did not witness the actual deposits.  On further examination, Plaintiff agreed that with respect to most of the payouts, Plaintiff did not know whether those sums were included with any bank deposits, and

he acknowledged that some of the payout amounts were identical to sums deposited on the same dates.

Plaintiff did not offer any deposit slips into evidence and admitted that Plaintiff never subpoenaed any deposit slips or even thought to ask the banks to provide any. The idea of requesting deposit slips had not occurred to Plaintiff, because the police had not requested any in their investigation. Plaintiff believed that if Plaintiff were to request such records now, the bank would not have any, because banks only retain records for a limited period of time; however, Plaintiff did not make any attempt to obtain the records.

### 6. Cigars 'N More

In March 1997, before Plaintiff knew about Defendant's financial problems, Defendant approached Plaintiff to express Defendant's interest in opening a cigar store in a space being vacated by Hollywood Rock. Defendant proposed a partnership, but Plaintiff was not interested and said it was a fad. A couple of months later, Plaintiff noticed that a Cigars 'N More had opened in the space. Plaintiff learned that Defendant owned the store. Shortly thereafter, Plaintiff learned that Defendant had transferred the store to Kam Haghi.

Plaintiff believed, after discussion with lawyers, that Defendant had transferred Defendant's interest in the store as part of a fraudulent conveyance to evade creditors. Plaintiff believed that Defendant purchased the business with Plaintiff's money. Plaintiff filed a police report, and the police wired Plaintiff to record a conversation with Defendant, but Plaintiff was not able to

reach Defendant on the telephone. Plaintiff tried to contact
Defendant several times, without avail.

## II. Conclusions of Law

Plaintiff asserts a single claim: that Defendant embezzled
funds and that the debt resulting from the embezzlement is not
dischargeable under § 523(a)(4). Plaintiff contends that Defendant
withdrew more money from the Camden Avenue Store than the profits
to which Defendant otherwise would have been entitled, and that
Defendant took this money for Defendant's personal use.

As discussed above, although the Second Amended Complaint does
not assert any claims under § 523(a)(4) and purports to assert a
claim only under § 523(a)(2), Plaintiff abandoned all claims apart
from the embezzlement and fiduciary fraud claims. The Court
dismissed the fiduciary fraud claim and ruled that the embezzlement
claim could proceed to trial. This is the only claim which is now
before the Court. The burden of proof on this nondischargeability
claim lies with Plaintiff. See Ghomeshi v. Sabban (In re Sabban),
600 F.3d 1219, 1222 (9th Cir. 2010).

Embezzlement under § 523(a)(4) is "the fraudulent
appropriation of property by a person to whom such property has
been entrusted or into whose hands it has rightfully come."
Transamerica Comm. Fin. Corp. v. Littleton (In re Littleton), 942
F.2d 551, 555 (9th Cir. 1991). To prove embezzlement, Plaintiff
must prove: "(1) property rightfully in the possession of a
nonowner; (2) nonowner's appropriation of the property to a use
other than which [it] was entrusted; and (3) circumstances
indicating fraud." Id.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   In addition to the three elements outlined above, a claim of

2   embezzlement under § 523(a)(4) requires a specific intent to

3   defraud.  Littleton, 942 F.2d at 555.  In Littleton, the creditor

4   did not meet its burden of proof on the embezzlement claim, because

5   the debtors did not act with an intent to defraud the creditor.

6   Id. at 556.  Instead, the debtors' "dominant motivation" was to

7   make their business survive.

8       The requirement of specific intent is supported by Bullock v.

9   BankChampaign, N.A., 133 S. Ct. 1754 (2013), in which the Supreme

10  Court addressed the mental state required to accompany a claim of

11  fiduciary defalcation under § 523(a)(4).  The Supreme Court

12  concluded that defalcation, like embezzlement, "requires an

13  intentional wrong."  Id. at 1759.  In the defalcation context, such

14  requirement can be met by conduct which the actor knows is

15  improper, or by "reckless conduct of the kind that the criminal law

16  often treats as the equivalent."  Id.  In dicta, the Supreme Court

17  stated that "embezzlement requires a showing of wrongful intent[,]"

18  including an intent to deprive, and cited Neal v. Clark, 95 U.S.

19  704, 709 (1878), for the proposition that embezzlement requires

20  either moral turpitude or an intentional wrong.  Bullock, 133 S.

21  Ct. at 1760.

22      Courts to consider the scienter requirement for an

23  embezzlement claim consistently have ruled, or otherwise stated,

24  that a claim of embezzlement requires a specific intent to defraud.

25  See Indo-Med Commodities, Inc. v. Wisell (In re Wisell), 494 B.R.

26  23, 39-41 (Bankr. E.D.N.Y. 2011) (there must be an actual intent to

27  defraud the plaintiff); Halliburton Energy Servs., Inc. v. McVay

28  (In re McVay), 461 B.R. 735, 745 (Bankr. C.D. Ill. 2012); Weeber v.

Boyd (In re Boyd), 322 B.R. 318, 326 (Bankr. N.D. Ohio 2004) (an embezzlement claim requires a "specific intent to actually do harm"); Burlington Industries, Inc. v. Wilson (In re Wilson), 114 B.R. 249, 252 (Bankr. E.D. Cal. 1990); Denton v. Hyman (In re Hyman), 502 F.3d 61, 68 (2d Cir. 2007) (embezzlement under § 523(a)(4) requires a showing of "actual wrongful intent"). "A wrongful appropriation of property under an erroneous belief of entitlement does not equate to the fraudulent intent necessary for embezzlement." McVay, 461 B.R. at 745.

To assert a claim for embezzlement, Plaintiff must have standing. Plaintiff must establish that Defendant embezzled property which belonged to Plaintiff. Bankers Trust Company, N.A. v. Hoover (In re Hoover), 301 B.R. 38, 52 (Bankr. S.D. Iowa 2003); see also Chrysler First. Comm. Corp. v. Nobel (In re Nobel), 179 B.R. 313, 315 (Bankr. M.D. Fla. 1995) (embezzlement claim could not be maintained by a plaintiff which lacked ownership of the allegedly embezzled funds); Sheriden Woods Health Care Center, Inc. v. Floyd (In re Floyd), 359 B.R. 431 (Bankr. D. Conn. 2007) (citing Nobel for the proposition that a plaintiff cannot assert an embezzlement claim unless the property that was embezzled was the plaintiff's property). In Hoover, the court stated: "This Court concurs with those decisions that have held or implied there is a requirement that the embezzled property belonged to the adversary complaint plaintiff. To hold otherwise would widen the pool of creditors who could utilize the embezzlement prong of section 523(a)(4) beyond that contemplated by Congress." Hoover, 301 B.R. at 53.

In the context of ruling on Defendant's motion for summary judgment, and construing the evidence in a light most favorable to the Plaintiff,[40] the Court ruled that any money which came into Defendant's possession on behalf of third parties appeared to satisfy the first element of the claim. In doing so, the Court left open the possibility that Plaintiff might lack standing to pursue a claim of embezzlement, stating that this was an issue which the parties should address in their trial briefs. Although the Court invited the parties to brief this specific issue, Plaintiff never filed a post-trial closing brief. Also, the Court ruled that if Debtor appropriated those funds to his own use, then that appeared to satisfy the second element of the claim. As to the third element, the Court ruled that the filing of a fictitious business name statement and the opening of a second bank account were circumstances that could indicate fraud. However, the Court did not address whether there was a specific intent by Defendant to defraud Plaintiff.

**Property Rightfully in the Possession of a Nonowner**

It cannot be reasonably disputed that Defendant came into the rightful possession of property of another. In operating the Camden Avenue store, Defendant received funds on behalf of AT&T, PG&E, PacBell, Western Union, and the money order companies on a daily basis. Although Defendant had no contractual relationship

---

[40] Any findings made in the context of the summary judgment ruling are not binding, here, because such findings were premised upon a construction of the evidence that was most favorable to Plaintiff. Unlike in the summary judgment context, the Court may now weigh the evidence and assess the credibility of the witnesses, and the Court is no longer required to construe the evidence in a light most favorable to Plaintiff.

with these companies, Defendant was obligated to make sure that there were adequate funds in the bank to cover the debits made by -- or payments made to -- these companies.

However, Plaintiff has failed to establish that Plaintiff had any ownership interest in these funds. The lease provided that the Camden Avenue store was Defendant's store, to operate in his "own fashion, free of control" by Plaintiff.

Plaintiff has testified that Plaintiff was obligated, as a guarantor, to pay AT&T, PG&E, PacBell, Western Union, and the money order companies if Defendant failed to do so. However, Plaintiff offered no evidence to corroborate that Plaintiff (or SRA) held any such legal obligation, and admitted that Plaintiff did not retain any of the contracts which might have shed light on Plaintiff's relationship with these vendors. Moreover, there was no evidence that even if Plaintiff (or SRA) were the guarantor, that this would give Plaintiff (or SRA) any ownership interest such that Plaintiff (or SRA) would have standing to sue for embezzlement.

The only property on which an embezzlement claim might possibly lie is the $10,000 in operating cash. The strongest evidence as to the origin of the $10,000 is the lease, which specifically stated that this $10,000 came from, and was the property of, SRA. The Court finds, based on the evidence, that the $10,000 was provided to Defendant by SRA. According to Plaintiff's testimony, SRA was an independent corporation. However, Plaintiff also testified that Plaintiff provided the $10,000 in operating cash.[41] Plaintiff may have meant that Plaintiff provided the money

_____

[41] Apart from the lease, which specifically provides that the funds came from SRA, Plaintiff offered no other evidence or
(continued...)

through SRA. For purposes of this decision, the Court will assume, arguendo, without deciding, that Plaintiff had an ownership interest in these $10,000, such that Plaintiff has standing to assert a claim for embezzlement of the $10,000.[42]

### Nonowner's Appropriation of the Property to a Use Other Than for Which it was Entrusted

Plaintiff testified that check cashing businesses operated by using the float which is generated by the money coming into the business prior to any debits. Plaintiff expected that Defendant would use cash on hand for business operations, including for wages to Mr. Oda. The cash on hand consisted of the $10,000 in cash provided by Plaintiff (or by SRA), as well as the other cash which was transacted through the business.

There was some evidence that Defendant may have failed to use the $10,000 as these funds were intended to be used. Plaintiff demonstrated that Defendant withdrew substantial funds from the business in excess of the profits, to which Defendant would otherwise have been entitled under the express terms of the lease. For instance, during Defendant's first month operating the business, the profits were only $9,115.34, but the amounts taken from the business exceeded the profits; however, as discussed

_____

[41](...continued)
explanation as to the exact source of the $10,000.

[42] The Court notes that Plaintiff has not demonstrated that he has standing to bring an embezzlement claim. To the extent the $10,000 came from SRA, as the lease specifically provides, then SRA, not Plaintiff, would hold the embezzlement claim. The Court is aware from public records, of which the Court has taken judicial notice, that SRA has been dissolved. Nevertheless, Plaintiff has not demonstrated why Plaintiff has standing to pursue that claim. However, the Court is not basing this decision on that point.

_supra_, it was unclear whether the amounts taken from the business were deposited back into the bank or taken by Defendant for his personal use.  Plaintiff also demonstrated that, during the relevant period, Defendant spent as much as $8,000 -- perhaps much more -- on flight instruction; Defendant was unable to explain how Defendant obtained the funds for this purpose, or how much Defendant had actually spent on flight instruction.  Defendant admitted that in withdrawing funds, Defendant sometimes did so for personal uses, such as to pay his rent.

However, Plaintiff was unable to trace the money, and it was possible that many of the funds Defendant withdrew from the business were later redeposited into the business' bank account. At least some of the withdrawn sums were direct matches with the amounts of deposits made on the same dates.  It was also possible that Defendant paid for his flight instruction from the business' profits, albeit meager though they were.  Further, considering the cash-centric nature of the business, $10,000 is not a large sum of money; it is difficult to believe that any of the original $10,000 remained after the first few weeks of October 1996.

The evidence is unrefuted that Defendant operated the business so poorly that Defendant began to kite checks -- an illegal activity -- to generate a cash flow.  Defendant kited far more than $10,000 in checks, which is highly suggestive that the $10,000 had been spent in its entirety.  Since the purpose of the $10,000 was to give Defendant operating cash, the Court assumes, for purposes

of this decision, that Defendant used all or some of the $10,000 for a purpose other than for which it was entrusted.[43]

**Circumstances Indicating Fraud**

The only potentially fraudulent activity which Plaintiff has established, and which Defendant has not denied, is the check kiting. A kiting scheme can be the basis for a nondischargeability judgment. See Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082 (9th Cir. 1996). In Eashai, the debtor used a credit card kiting scheme to incur debt on a credit card which the debtor never intended to repay. The Ninth Circuit ruled that the debt was not dischargeable under § 523(a)(2)(A),[44] because the debt was obtained by actual fraud. To reach this result, the Ninth Circuit considered the twelve factors set forth in In re Dougherty, 84 B.R. 653 (B.A.P. 9th Cir. 1988), for purposes of analyzing the debtor's intent to deceive, as well as whether the creditor had met its burden of establishing a false representation, creditor's

---

[43] As discussed above, the problem with this assumption is that the original $10,000 in operating cash was undoubtedly rapidly replaced by other cash through normal operation of the business. The parties did not address whether this fact is significant. Nevertheless, even though the Court makes this assumption, which is unfavorable to Defendant, Plaintiff cannot prevail for the reasons discussed infra. The Court also notes, as discussed above, that the $10,000 likely came from SRA, not from Plaintiff.

[44] In this way, Eashai is distinguishable. The only claim before this Court is an embezzlement claim. Plaintiff has not asserted any claim -- nor made any argument -- that the check kiting resulted in a nondischargeable debt under § 523(a)(2)(A), as was the situation in Eashai, or under any other provision of § 523. Rather, Defendant's check kiting in the case at bar is relevant to whether there were circumstances indicating fraud. In this regard, Eashai is instructive. Further, the outcome is different. As discussed infra, evidence as to Defendant's intent to defraud Plaintiff is lacking.

justifiable reliance on the representation, and damages. <u>Eashai</u>, 87 F.3d at 1088-90. In <u>Eashai</u>, the false representation was two-fold: the debtor created the illusion that the debtor's accounts were in good standing, and the debtor failed to disclose the debtor's intention not to repay the credit card debt. <u>Id.</u> at 1088.

Check kiting is different from credit card kiting. "Check kiting generally involves the passing of checks between two or more banks to obtain unauthorized credit from each bank during the time it takes the checks to clear." <u>Bay Area Bank v. Fidelity and Deposit Company of Maryland</u>, 629 F. Supp. 693, 695 n.2 (N.D. Cal. 1986). By contrast, in credit card kiting, a borrower uses one or more credit cards to make minimum payments on another credit card or cards, with no intention of paying the underlying debt. <u>See</u> <u>Eashai</u>, 87 F.3d at 1086. Nothwithstanding these differences, both types of kiting involve extensions of credit from a bank based on a false representation.

In <u>Eashai</u>, the plaintiff was the bank which had extended the credit that the debtor never intended to repay. In the case at bar, Wells Fargo Bank and the Bank of Santa Clara were the two creditors involved in Defendant's check kiting scheme. However, the creditor claiming a nondischargeable debt is not a bank; instead, the creditor is Plaintiff, who was an officer of the corporation which held the account at Wells Fargo Bank.

The <u>Dougherty</u> factors are tailored to credit card debt, but they are instructive concerning whether there was an intent to defraud. These factors are:

> 1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

Defendant's kiting activities occurred in 1997 -- approximately nine years before Defendant filed for bankruptcy. Defendant identified at least eight checks which he used as part of his check kiting scheme; the amounts of these checks ranged from $6,000 to $42,000. In total, Defendant successfully kited at least $87,750.[45] This was a substantial sum, and the checks were written at a time when Defendant was admittedly in poor financial shape. Defendant was the owner of a business. Arguably, Defendant was employed; he worked for himself in operating the Camden Avenue store.[46] However, Defendant played fast and loose with the cash

_____

[45] This total excludes the two checks on which Plaintiff stopped payment, as well as the check which Defendant forged from Defendant's mother's account, which was never paid.

[46] The Court found no law -- binding or otherwise -- addressing
(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

assets of the store, withdrawing thousands of dollars without keeping detailed records as to how the funds were being used. Defendant admitted that Defendant withdrew some cash for his personal use and that Defendant did not keep track of how much he withdrew for that purpose. This failure to keep records might be attributed to a lack of financial sophistication, but could also have been a calculated act to conceal Defendant's spending habits. However, Defendant was entitled to enjoy the profits of the business, and it appears that he disclosed every single withdrawal of cash on the dailies.

Instructive is the decision in Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873 (B.A.P. 6th Cir. 2001). In that proceeding, the Sixth Circuit BAP ruled that the debtor's check kiting scheme amounted to "actual fraud" which resulted in a nondischargeable debt owed to the bank pursuant to § 523(a)(2)(A), because the debtor never intended to make payment. Id. at 878-79. In that proceeding, the debtor possessed an actual intent to defraud the bank and had engaged in acts of moral turpitude and bad faith. Id.

Here, Defendant has admitted that he kited checks. By kiting checks, Defendant essentially obtained an interest-free loan from the two banks involved in the kiting scheme. Defendant testified that Defendant engaged in check kiting to buy time for additional cash flow; it was a stop-gap measure to solve Defendant's cash flow problem. There was no evidence that Defendant ever lacked any intention to provide funds to cover the checks once the business

---

[46](...continued)
whether self-employment satisfies the eighth Dougherty factor.

improved.  Nor was there any evidence that Defendant understood that check kiting was illegal at the time when Defendant was kiting checks; instead, Defendant testified that he "found out later" that check kiting was illegal.  It was implicit from Defendant's testimony that Defendant intended to pay back these funds once the business became more profitable.  Also, Defendant repeatedly testified that Defendant never intended to harm Plaintiff.  This is plausible; the Court doubts that Defendant ever expected that the check kiting would be discovered before the funds could be repaid, or that such discovery could have an immediate, negative consequence.  In fact, there was no evidence that Defendant thought at all about the consequences of the check kiting apart from the immediate cash flow relief which the kiting provided, or that Defendant considered any potential impact of the kiting on Plaintiff or SRA.  In these ways, the proceeding at bar is distinguishable from <u>Vitanovich</u>.

There is also another basis for distinction; in <u>Vitanovich</u>, the debt was nondischargeable <u>vis</u> <u>a</u> <u>vis</u> the bank.  Here, the bank makes no such claim.  Plaintiff has attempted to step into the shoes of the bank by assuming Defendant's debt created by the kited checks, but there is no evidence that Plaintiff was legally obligated to do so.  Plaintiff testified that Plaintiff "had to" cover the losses from the kited checks, but Plaintiff provided no supporting evidence which showed that Plaintiff <u>personally</u> (or SRA, as the account-holder on the Wells Fargo account) had a legal obligation to the bank to make payment, or that Plaintiff in fact made such payment.  Assuming, <u>arquendo</u>, that SRA had such an obligation given SRA's status as the account-holder, the fact

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  remains that there was no evidence that Defendant intended to

2  defraud Plaintiff or SRA, for the reasons discussed <u>supra</u>.

3      Instead, the evidence suggests that to the extent any payment

4  was made by Plaintiff <u>personally</u>, it was made to salvage a bad

5  situation; Plaintiff was trying to sell his businesses in the midst

6  of a marital breakup, and Plaintiff made a business judgment to

7  take on the check kiting debt in order to allow the sale of the

8  check cashing stores to be consummated.

9      There is no question that Defendant was a poor manager of the

10  Camden Avenue store and was very careless with the store's

11  finances.  The store was marginally profitable, but Defendant

12  miscalculated the amount of the profits when making withdrawals for

13  his own use.  This resulted in a shortfall.  Defendant then made

14  the exceedingly poor judgment call to kite checks to buy time to

15  pay the store's creditors.  However, Plaintiff has offered no

16  evidence that Defendant intended to defraud Plaintiff.  Quite to

17  the contrary, the evidence shows that Defendant disclosed every

18  penny he took from the business.  Because Plaintiff has not

19  demonstrated that Defendant had a specific intent to defraud

20  Plaintiff, the embezzlement claim fails.

21

22  **III. Summary**

23      Plaintiff has failed to establish a claim of embezzlement

24  against Defendant under 11 U.S.C. § 523(a)(4).  Therefore, the

25  Court does not need to address Plaintiff's request for punitive

26  damages.  Judgment shall enter in favor of Defendant.

27          \*\*\* End of Memorandum Decision \*\*\*

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Court Service List

Ray Razavi
1501 De Anza Way
San Jose, CA 95125

Michael Zamani
PO Box 59371
San Jose, CA 95159

** Attorney Stanley A. Zlotoff to be served via ECF